FILED

2011 Nov-22  PM 02:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHAVON LEWIS, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 10-AR-1770-S |
| | } | |
| WACHOVIA BANK | } | |
| (A WELLS FARGO COMPANY) | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

Before the court is the motion of defendant, Wachovia Bank, a division of Wells Fargo & Co. ("Wachovia"), for summary judgment as to all claims brought by plaintiff, Shavon Lewis ("Lewis").  Doc. 17.  Lewis brings claims against her former employer Wachovia for sex and pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ("PDA"), and for race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981").  For the reasons set forth below, Wachovia's motion for summary judgment will be granted.

## FACTS[1]

_____

[1] Because of the procedural posture, all facts are viewed in the light most favorable to Lewis.  However, Lewis responds to a number of Wachovia's facts by stating that she cannot admit or dispute the facts asserted.  Lewis's failure to point to any record evidence to dispute Wachovia's facts amounts to an admission of such facts.  *Richardson v. Honda Mfg. of Ala., LLC*, 635 F. Supp. 2d 1261, 1266 n.5 (N.D. Ala. 2009) ("Facts not disputed by [plaintiff] are admitted for summary judgment purposes."); Fed. R. Civ. P. 56(e)(2).  Additionally, Lewis

Lewis, who is black, began working for SouthTrust Bank as a teller on April 13, 1998.[2]   Over the next seven years, Lewis assumed the positions of Teller Manager at Wachovia's Mountain Brook, Alabama location, Branch Operations Coordinator at its Hoover, Alabama location, and Branch Operations Manager at its office in Birmingham, Alabama.

In 2005, Lewis became a Retail Teller Coach for Wachovia's Birmingham, Alabama, Montgomery, Alabama, and Jackson, Mississippi markets.   In this position, Lewis traveled among Wachovia's branches to coordinate new hire Teller training, created training schedules, and sometimes led training sessions using pre-prepared materials.   Lewis did not have any performance or disciplinary issues while employed at Wachovia, and in fact, she received several awards and accolades during her employment.

Sometime prior to July 30, 2008, Lewis's supervisors informed her that her position was being displaced as part of a reduction-

---

repeatedly asserts that declarations from Wachovia's witnesses should be disregarded because they are "interested witnesses." Lewis apparently did not take any depositions during the discovery phase of this action, so Wachovia had to use declarations or affidavits to present some of its facts.   The court will consider Wachovia's affidavits.   *See Sabatier v. SunTrust Bank*, 301 F. App'x 913, 915 (11th Cir. 2008) ("there was no error committed [by the district court] in relying on the testimony of interested witnesses (the Bank's employees) in granting summary judgment").

[2] On November 1, 2004, Wachovia Corporation merged with SouthTrust Corporation, including SouthTrust Bank, and the bank began to operate under the name Wachovia.

in-force.   As part of her displacement, Lewis signed a severance agreement, by the terms of which she received six months of her base salary.   Lewis's employment with Wachovia terminated at the end of October 2008.

On December 10, 2008, Lewis gave birth to her son, Caleb, one month before her due date.   Lewis is not married to her son's father and does not know where he resides.

Even though Lewis's employment had ended and she was on "lay-off" status, Wachovia treated her as an internal candidate with respect to applying for jobs, and she was eligible to apply online as jobs became available.

**Lewis Interviews for the Retail Teller Coach Position**

On April 6, 2009, Lewis applied for the Retail Teller Coach position in Birmingham, Alabama, a position that would cover the Birmingham, Gadsden, and Anniston, Alabama markets.   Human Resources Recruiter Jamie Covington ("Covington") notified Lewis that an interview would take place on April 17, 2009, and enclosed information concerning the competencies that would be evaluated during the interview.   Lewis reviewed this information prior to her interview.   On April 17, 2009, Lewis attended an in-person interview with four interviewers: Service Leader Camille Brown ("Brown") (black female, one child), Covington (white female, two children, one of whom was born in June 2008), Service Leader Katrina Samoranski ("Samoranski") (white female, two children), and

Market Support Consultant Tanya Jackson ("Jackson") (white female, one child).   Lewis already knew all of the interviewers from her prior work as a  Teller Manager and a Retail Teller Coach, and she considered her relationships with them to be in "good standing."

Before asking any interview questions, the interviewers asked Lewis a series of questions about her personal life, which Lewis described in her deposition as "play[ing] catch-up" with her because they had not seen her in several months during the time that she was in "lay-off" status and since she had her baby.  One interviewer asked Lewis how she was doing, to which she responded, "I'm doing well" and "I'm job searching."  Someone then inquired, "How was your labor?"  Lewis replied, "It went well."  Another interviewer asked Lewis whether she had a premature labor and whether her son was born premature and Lewis responded, "Yes, I did" and "Yes, he was."  Jackson said, "What did you do when you found out you were pregnant?" to which Lewis responded, "I was thrilled and nervous.  Any new mom would be."  Someone then asked her how she was handling the situation and Lewis said, "I'm doing well."  Brown asked Lewis how does it feel to be a mom and Lewis responded, "Interesting.  I'm sure you can relate with you being a mom."  Someone stated that "it [is] more challenging to work as a single parent" because the position would require frequent travel from Birmingham to Gadsden and Anniston, and Lewis agreed with the statement.  Brown or Samoranski then said that travel "could be a

burden on anyone, especially someone such as yourself with a child and being a single parent with a possible special needs child." Lewis replied that she was aware of the travel requirements and added, "Great, I know that territory very well. I was born and raised in Anniston and my father's family is from Gadsden. So I know the area like the back of my hand."

During this discussion regarding travel requirements, someone asked how Lewis would manage childcare issues if she were selected for the position.  Lewis replied that she would secure childcare and it would not be an issue.  Brown then inquired whether her son had any special needs or whether he was healthy enough for her to work because she wanted to know whether that would interfere with Lewis traveling.  Lewis said, "No, it would not," and affirmed that her child was healthy.  Jackson said, "I would love to see a picture of the baby," and the other panelists said, "Yes, we would love -- can't wait to see Caleb, is that his name?"  Lewis responded, "Great, would love to show you pictures of Caleb." Covington then said they were just concerned and glad to see that Lewis was doing well.  Lewis responded, "That was great, thank you for the concern."  Brown added that it looked as though Lewis was handling the situation the best that she could, to which Lewis said, "Thank you."  Brown also said, "You will make it through, we all make it through," and Lewis again said, "Thank you."  Jackson asked, "Where's the father?" and Lewis said, "He's not present at

this time." Someone then asked whether "Caleb's father was involved in [her] life, were [they] going to get married," to which Lewis responded, "No." An interviewer asked if Lewis was getting any help or assistance, and she replied, "Yes, I am getting help and assistance." Jackson then said, "I'm sure that you have a support system, friends that will help you get through." Lewis said she did and that she "feel[s] blessed to have that." Jackson, Brown, and Covington told Lewis that if she needed anything, they would be available to assist her, and Samoranski nodded her head in agreement. Lewis said, "Thank you" in response. After this conversation, the interviewers thanked Lewis for giving them an opportunity to "catch up and make sure that [she was] okay."

Then the interviewers began asking the interview questions, which were based on the competencies that Covington had given to Lewis prior to the interview. They requested that Lewis respond using the "STARs" method (provide a Situation or Task, the Action she took, and the Result). The interviewers rated Lewis's responses on a scale of one to five, five being the highest score. At some point during the questioning, the interviewers took a break and one of them left the room. During the break, Jackson asked whether Lewis's son was okay and someone inquired if he had "any illnesses or any developmental issues," to which Lewis responded, "He is a healthy baby boy." Someone asked to see a picture of Lewis's son. Lewis then shared pictures of her son and, upon

seeing the pictures, the interviewers said, "He's beautiful" and made other similar comments.   During the time that Lewis was sharing pictures, the individual who left the room returned, and the interview resumed shortly thereafter.   After the interviewers finished asking their questions, they explained the next steps in the interview process.   They also informed Lewis that other candidates would be interviewing for the position.   Lewis's interview lasted at least one hour.

On the same day, the same panel of interviewers also interviewed Kenyata Minniefield ("Minniefield"), a black female who has one child who is around nine years old, and Kerri Ash, a black female, for the Retail Teller Coach position.   Lewis, Minniefield, and Ash all met the qualifications for the Retail Teller Coach position.[3]   Minniefield and Ash were asked the same questions that Lewis was asked.

Although Brown sought feedback from the other panelists, Brown was the final decision-maker on who to select for the Retail Teller Coach position.   Brown selected Minniefield for the position.

---

[3] The minimum qualifications for the Retail Teller Coach position were one year of leadership experience, three years of Teller experience, and extensive knowledge of Teller systems, policies, and procedures.   Minniefield had been a Teller with Wachovia from 2002 to 2005, and in 2005, she was promoted to Teller Manager.   As Teller Manager, Minniefield reported directly to Brown.   Ash had been displaced from her former position as a Retail Teller Coach in July 2008; she then applied for and was selected for a Teller Manager position in September 2008 and held this position at the time of the interview.

Brown stated that she selected Minniefield because she received the most favorable ratings from the interviewers based on her responses to interview questions, and because she had recent Teller experience, she would be able to use this experience to provide better training to Teller Managers and Tellers, which was a part of the Retail Teller Coach position.  Brown stated that she decided to hire Minniefield over Lewis because she believed that Lewis provided a false answer during her interview and because she did not use examples in some of her responses that were based on her prior experience as a Retail Teller Coach.  Brown denies having based her decision on the old-friend conversation she and the other interviewers had with Lewis regarding her and her son's well being or on any of Lewis's responses to questions asked when they were just "catching up."

Sometime after the interview, Lewis learned that Minniefield had been selected for the position.

**Lewis Interviews for the Teller Manager Position**

On the same day she applied for the Retail Teller Coach position, Lewis also applied for a Teller Manager position at Wachovia's Hueytown, Alabama location.  Human Resources Recruiter Terrica Cook ("Cook"),[4] notified Lewis that an interview would take place on April 21, 2009.  On April 21, 2009, Lewis attended an in-

---

[4] Terrica Cook subsequently changed her name to Terrica Richardson.

person interview for the Teller Manager position with two interviewers: Hueytown Branch Manager Charmaine Hardy ("Hardy"), a black female, and Service Leader Jennifer Jones ("Jones"), a white female.  Lewis knew both interviewers from her prior work at Wachovia and considered her relationships with both to be in "good standing."

Again, before the interview, the interviewers asked Lewis questions about her personal life, which Lewis described in her deposition as "play[ing] catch-up" because they had not seen her in a few months, since she had a baby.  Jones asked, "How does it feel to be a new mom?" to which Lewis responded, "Excited and nervous." Someone then said, "How are you making it as a single parent?" and Jones added, "That has got to be hard in this day and time."  Lewis said, "It could be, but I'm doing well."  Jones asked, "How [are you] handling childcare?" and Lewis replied, "I'm handling my situation well."  Jones then inquired, "What does [your] family think?" and Lewis said, "They think very highly of me and their new grandson."  Jones next asked, "Is Caleb's father going to be involved in his life at all? Because [we] had heard that he had not been around since Caleb's birth," to which Lewis responded, "Not at this time" and "No, he had not."  Jones added, "How is that going to affect [you] and Caleb?" and Lewis said, "We're doing fine." Jones and Hardy both said, "If there is anything [we] can do to help, let [us] know" and Lewis thanked them.

Jones then asked whether Caleb was healthy or had special needs because she had heard he was born prematurely, and Lewis responded, "He is a healthy African-American little boy." Jones said, "How difficult is it going to be for [you] to be able to afford for pay for childcare?" and "Has it been challenging for [you] to be able to find childcare in such short notice?" Hardy added, "Yeah, that could be difficult." Lewis said, "It could be challenging for anyone, but we are doing fine." Hardy asked whether Lewis was going to find childcare near her home or near work, and Jones agreed with Hardy's question. Lewis replied, "Childcare has been selected as needed for my household." At some point, Jones requested to see a picture of Caleb and Hardy added that she would love to see a picture. Lewis said she would be glad to show them a picture and then did so. Jones and Hardy responded that Lewis's son looked great.

Jones and Hardy then began the interview, asking the competency-based questions and rating Lewis's responses on a scale of one to five. During the questioning, Jones asked how Lewis would handle the travel to Hueytown "being a single parent and being the only sole [sic] person in Birmingham that would handle the responsibilities of taking care of [her] son." Hardy agreed to the question to ensure that the new Teller Manager would be able to "handle the operating hours." Lewis responded, "The care of Caleb would be handled appropriately for my household." Jones then

10

confirmed that Lewis lived in Calera and Hardy mentioned that the daily travel between Calera and Hueytown "would be challenging on anyone, especially a single parent such as [you] not having any other family in the Birmingham market." Lewis said, "Yes, it could be on anyone that lived in Calera." Jones asked if Lewis was still familiar with the Bank's operating hours and Hardy added that "they would not be able to excuse [her] from leaving early or coming in late due to childcare or needs for Caleb." Lewis said, "I would not expect the level of [expectation] to change because I am the Teller Manager of that financial center." Jones also asked if Lewis was aware of the "tremendous turnover" at the Hueytown branch and both panelists said that they needed someone stable to fill the Teller Manager role. Lewis said she was very familiar with the turnover, and she understood why they needed someone stable. Jones then said that they might ask Lewis to commit to stay in the position longer than a "normal applicant" to ensure stability. Lewis asked if this would be required of all applicants, and Jones said, "Yes, more than likely."[5]   Lewis's interview was finished

---

[5] Wachovia explains that it maintains a practice in the Birmingham market that all applicants for managerial positions, including internal candidates, must verbally commit to staying in their new position for one year before applying for a different position or leaving the bank. If a candidate refuses to commit to the one-year agreement, then he or she is disqualified for the position. Lewis disputes this, stating in her deposition that a human resources official told her that the policy is that internal candidates, of which she was one, do *not* have to pledge to remain in a position for a period of time before seeking other internal job opportunities.

after approximately one hour.

On the same day, the same panel also interviewed Takisha James ("James"), a black female, for the Teller Manager position.  James also met the qualifications for the position,[6] and she was asked the same questions that Lewis was asked, except for the questions that came up about childcare and distance.

Shortly after her interview, Cook contacted Lewis and asked if she would sign an agreement promising not to leave the Hueytown branch or bid on other jobs for at least a year if she was selected for the position.  Cook said if Lewis did not agree, she would not be considered for the position.  Lewis asked Cook if other applicants were being asked to sign the agreement and Cook replied "No."  Lewis then asked Cook why she was being asked to make a commitment if others were not, and Cook said that the request came from Jones.  Lewis asked for a couple of days to think about it, and she later called Cook and informed her that she would not sign a pledge if none of the other applicants were being asked to do so and stated that asking her to do so was discriminatory.  Cook said she would pass the information to Jones.

---

[6] The minimum qualifications for the Teller Manager position were one to two years of face-to-face customer service experience, cash handling experience, and a preference for one to two years of Teller or Manager experience.  James worked as a Teller at Wachovia from 2000 to 2007, when she was promoted to a Service Transaction Specialist, the same position she held until the interview.  In that role, she assisted with and completed customer sales and served as a mentor for Tellers at her branch.

After this discussion, Cook informed Hardy and Jones that Lewis was no longer interested in the Teller Manager position because it was too far of a drive from her home.  However, Lewis denies that she ever expressed to Cook that she was no longer interested in the position because it was too far a drive from her home.

Although Hardy sought Jones's input on who to hire, Hardy made the ultimate hiring decision for the Teller Manager position. After hearing from Cook, Hardy decided to hire James for the position based on her interview responses and banking experience, as well as Hardy's belief that Lewis was no longer expressing interest in the position.  In addition, Hardy says that she chose James because she verbally committed to saying in the position for at least one year.[7]  This assertion is not contradicted.  Hardy denies having based her decision on the conversation she and the other interviewers had with Lewis regarding her and her son's well-being or on any of Lewis's responses to questions asked when they were just "catching up."

On April 27, 2009, Lewis received an email from Cook notifying her that she had not been selected for the Teller Manager position.

On May 27, 2009, Lewis filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Wachovia discriminated against her based on her sex and pregnancy

---

[7] James is still the Teller Manager at the Hueytown branch.

by not hiring her for the Retail Teller Coach position on April 17, 2009.[8]  Lewis did not mention in her EEOC charge the fact that after her April 21, 2009, interview for the Teller Manager position, she was not hired.

On June 30, 2010, after obtaining a right-to-sue letter from the EEOC, Lewis filed this complaint.  After discovery, Wachovia filed its motion for summary judgment, Doc. 17, to which Lewis has responded, Doc. 22, and Wachovia has replied, Doc. 24.

## DISCUSSION

Lewis alleges that Wachovia discriminated against her based on her race, sex, and pregnancy by asking inappropriate questions and

---

[8] Lewis checked both the "sex" and "other" boxes on her EEOC charge form, and she stated:

> I had my child on December 10, 2008 and began reapplying for positions with the Respondent after that time.  On April 13, 2009, I applied for my old position which had been reinstated in this geographical area.  I was given an interview on April 17, 2009.  During this interview I was questioned about how I would manage child care issues if given job, I was asked whether the father of my child was involved in my life, as I am now unwed, and I was questioned about whether my child had any special needs and whether he was healthy enough for me to work.  The interview panel also asked whether I was contemplating getting married and whether traveling would be a problem since I was not married.

In her deposition, Lewis stated that she also checked the "other" box because she was not familiar with the discrimination laws and felt the need to protect herself until she sought legal counsel.

making stereotyped remarks during her interviews for the Retail
Teller Coach and Teller Manager positions and by not selecting her
for those positions.   Lewis contends that the interviewers'
questions and remarks stereotyped her as a black female who had a
child out of wedlock and whose child's father was not in the
child's life, and who thus would not be able to combine work and
motherhood and handle child care issues.   In other words, she
presents an intersectional or multi-faceted claim that depends on
a combination of facts and attitudes.   Put another way, she
complains of sex discrimination and/or pregnancy discrimination
and/or race discrimination, a claim that extends beyond her EEOC
charge.   She may be a uniquely protected applicant for employment,
that is, there has been no one like her before.

Lewis brings her race discrimination claim pursuant to Section
1981, which prohibits discrimination in the making of contracts and
also extends to the employment context.   *See* 42 U.S.C. § 1981(a)-
(b); *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1270 (11th
Cir. 2004).   She brings her sex discrimination claim pursuant to
Title VII, which precludes employers from discharging "any
individual, or otherwise  discriminat[ing] against any individual
with respect to his compensation, terms, conditions, or privileges
of employment, because of such individual's race, color, religion,
sex, or national origin....", 42 U.S.C. § 2000e-2(a)(1), and her
pregnancy discrimination claim pursuant to the PDA, which provides

that the prohibition against sex-based employment discrimination found in § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), applies with equal force to discrimination on the basis of "pregnancy, childbirth, or related medical conditions" and further states that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work."  42 U.S.C. § 2000e(k). Discrimination claims brought under all three statutes are subject to the same analytical framework for summary judgment purposes. *See Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (Section 1981 and Title VII "have the same requirements of proof and use the same analytical framework."); *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000) ("The analysis required for a pregnancy discrimination claim is the same analysis used in other Title VII sex discrimination suits.").

**Failure to Exhaust Administrative Remedies**

Before reaching the merits of Lewis's claims, the court will address Wachovia's argument that Lewis failed to exhaust her administrative remedies for her sex discrimination claim based on the Teller Manager position by not complaining about or alleging any facts in her EEOC charge that pertained to her interview for

16

the Teller Manager position on April 21, 2009.[9]  "No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge." *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000), *overruled on other grounds*, 338 F.3d 1304.  "EEOC regulations provide that charges should contain, among other things, '[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices.'" *Id.* (quoting 29 C.F.R. § 1601.12(a)(3)).  The purpose of the exhaustion requirement "is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Gregory v. Georgia Dept. of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004).  As such, "[a] 'plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Alexander*, 207 F.3d at 1332 (quoting *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n.8 (11th Cir. 1994)).  The relevant inquiry is whether the claims pursued in the judicial proceedings are "like or related to, or

---

[9] This exhaustion argument only applies to Lewis's sex-based discrimination claims.  Lewis's claim for racial discrimination, brought under Section 1981, is not subject to the same exhaustion requirements necessary in Title VII claims.  *See Caldwell v. Nat'l Brewing* Co., 443 F.2d 1044, 1046 (5th Cir. 1971).

grew out of, the allegations contained in [the employee's] EEOC charge." *Gregory*, 355 F.3d at 1280.  Importantly, "judicial claims are allowed if they 'amplify, clarify, or more clearly focus' the allegations in the EEOC complaint, but . . . **allegations of new acts of discrimination are inappropriate**." *Id.* at 1279-80(quoting *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989)) (emphasis added).

Lewis applied and interviewed for two **separate** positions. Yet, her EEOC charge only references the date of her interview for the Retail Teller Coach position and what happened immediately prior to and during that interview.  She nowhere gives notice of the April 21, 2009 interview or its aftermath.  As such, Lewis has failed to exhaust her administrative remedies with regard to her sex-based discrimination claim premised on the April 21, 2009, Teller Manager interview unless it is like or related to, or grew out of, the alleged discrimination related to her interview for the Retail Teller Coach position.  Put another way, the Teller Manager interview may only be considered by this court if an EEOC investigation into the circumstances surrounding the Retail Teller Coach interview called for an investigation of the discrimination Lewis now alleges with regard to the Teller Manager interview.

Lewis argues that both claims are based on the same discriminatory behavior, i.e., both interview panels engaged in sex and race stereotyping, such that they are intertwined.  However,

Lewis applied for and interviewed for two separate positions on two separate dates. Each position required different minimum qualifications. Each interview was conducted by a different panel of individuals, with no interviewers attending both. The decision-makers for each position were different—Brown for the Retail Teller Coach position and Hardy for the Teller Manager position. These differences indicate that by bringing a claim based on the April 21, 2009 Teller Manager interview, Lewis is attempting to allege an entirely "new act of discrimination" that never appeared in her EEOC charge, something she cannot do.

The case Lewis relies on for her position that the two instances are intertwined is distinguishable because it involved the assertion of new legal claims based on the same acts alleged in the EEOC charge, or the clarification of allegations already asserted. *See Gregory*, 355 F.3d at 1279-80. In contrast, Lewis here asserts a new claim of sex discrimination based on different events and different actors. What if she had had another unsuccessful interview on June 1, 2009, and wanted to fold that in? *See Hillemann v. Univ. of Central Fla.*, 167 F. App'x 747, 749 (11th Cir. 2006) (affirming summary judgment on claims relating to thirteen out of fifteen positions for which plaintiff applied because EEOC charge only mentioned two of the positions).

Further, a reasonable EEOC investigation into the circumstances surrounding Lewis's interview for the Retail Teller

Coach position would not likely have uncovered information about her interview for the Teller Manager position, because different individuals would have had to be interviewed and investigated.[10] If this court were to allow Lewis to pursue her sex discrimination claim premised on the April 21, 2009 interview, it would be undermining the oft-stated purpose of the exhaustion requirement, which is to "promote informal settlements," because without Wachovia and the EEOC being made aware that Lewis also intended to allege discrimination by the interviewers for the Teller Manager position, there was no realistic opportunity to encourage conciliation between Lewis and Wachovia. *See Wu*, 863 F.2d at 1547.

Accordingly, because Lewis alleges a new, discrete act of discrimination that the EEOC could not reasonably have been expected to investigate, she has failed to exhaust her administrative remedies with regard to her sex discrimination claim based on the April 21, 2009 Teller Manager interview, and those allegations will not be considered by this court. Wachovia's motion for summary judgment will be granted insofar as it pertains to Lewis's claim of sex discrimination premised on the April 21,

---

[10]In fact, Lewis submitted Wachovia's position statement to the EEOC as evidence in support of her response to the summary judgment motion.  The position statement only addresses the April 17, 2009 interview, and not the April 21, 2009 interview.  This fact suggests that Wachovia was not on notice that Lewis intended to allege discrimination in the April 21, 2009 interview, and further suggests that the EEOC did not investigate the April 21, 2009 interview.

2009 interview for the Teller Manager position.

**Pregnancy Discrimination Claim**

Turning now to the merits of Lewis's pregnancy, sex, and race discrimination claims that are not administratively barred, the court will first address Wachovia's argument that Lewis cannot establish a *prima facie* case of pregnancy discrimination because she was not pregnant or suffering from pregnancy-related medical conditions in April 2009, when she interviewed for the Retail Teller Coach as well as the Teller Manager position.  Indeed, at the time of her interviews, Lewis's son was around four months old, and she has not alleged that she was suffering from any medical conditions related to pregnancy or childbirth as of April 2009. The Eleventh Circuit has not addressed whether mere status as a "new mother," absent any other showing of lingering effects of pregnancy, is a protectable category under the PDA, but many other federal courts have held that the answer to this question is a resounding "no."[11]   The court need not decide this issue in the

---

[11] *See Piantanida v. Wyman Center, Inc.*, 116 F.3d 340, 342 (8th Cir. 1997) (affirming summary judgment because plaintiff's claim of discrimination based on her status as a "new mom" is not cognizable under the PDA); *Piraino v. Int'l Orientation Resources, Inc.*, 84 F.3d 270, 274 (7th Cir. 1996) (holding that plaintiff successfully alleged pregnancy discrimination, and stating that "[t]his is therefore *not* a case in which the claim relates *only* to an employer's refusal to hire (or reinstate) a mother with a young child, without a hint of any role that the earlier pregnancy played in the decision") (emphasis added); *Nance v. Buffalo's Café of Griffin, Inc.*, No. 1:03-CV-2887-WSD, 2005 U.S. Dist. LEXIS 20432, at *44 (N.D. Ga. Feb. 7, 2005) (holding that a woman is not a member of a protected class under

present case, however, because Lewis failed to respond to Wachovia's argument or make any arguments whatsoever regarding her pregnancy discrimination claim in her response brief. As such, she has abandoned her pregnancy discrimination claim under the PDA. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). Accordingly, summary judgment will be granted on Lewis's pregnancy discrimination claim.

**Race and Sex Discrimination Claims**

The court now turns to Lewis's race and sex discrimination claims premised on her April 17, 2009 Retail Teller Coach interview, and her race discrimination claim premised on her April 21, 2009 Teller Manager interview. Under the applicable framework,

---

the PDA where the effects of her pregnancy no longer exist at the time of the alleged adverse action), *adopted in part*, 2005 WL 2148548, at *7 (N.D. Ga. Mar. 30, 2005) (adopting summary judgment recommendation on PDA claim); *Kenney v. Ultradent Prods., Inc.*, No. 05-CV-1851 (RBM), 2007 WL 2264851, at *5 (D.N.J. Aug. 6, 2007) ("The plaintiff must have evidence that at the time of the adverse employment action she had a medical condition related to either the pregnancy or childbirth. . . . Being a new parent, however, is not a medical condition related to either pregnancy or childbirth."); *Finnegan v. Claires Stores, Inc.*, No. 08-517, 2008 WL 4276143, at *1 (W.D. Pa. Sept. 16, 2008) (dismissing claim because "[s]imply being a new parent does not suffice" to establish a *prima facie* case of pregnancy discrimination); *Brinkman v. State Dep't of Corr.*, 863 F. Supp. 1479, 1486 (D. Kan. 1994) (granting summary judgment because "plaintiff must do more than show that she was, past tense, pregnant. She must at least make a prima facie showing that her medical conditions at or near the time of [the adverse action] were, in fact, related to her pregnancy.").

Lewis may establish race and/or sex discrimination by presenting direct or circumstantial evidence.  If Lewis has direct evidence, "[Wachovia] must then prove that the same employment decision would have been reached even absent any discriminatory intent." *Young v. Gen. Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1988).  If Lewis has only circumstantial evidence, the analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is used.  Under this framework, Lewis must establish a *prima facie* case of discrimination, which creates a presumption of discrimination.  Wachovia must then offer one or more legitimate, nondiscriminatory reasons for the employment action to rebut the presumption.  If Wachovia successfully rebuts the presumption, the burden shifts to Lewis to discredit the proffered nondiscriminatory reasons by showing that they are pretextual.  *Standard*, 161 F.3d at 1331.

Without quoting any specific statements made by the interviewers, Lewis contends generally that she has direct evidence of sex and  race discrimination in the interviewers' comments and questions about her pregnancy, whether her baby was premature, whether her baby had any health issues, the difficulties in being a single parent, especially one with a special needs child if travel is involved in the job, where the father of her child was, whether she was planning on getting married, whether she was getting any help or assistance from the father, and whether she

could secure child care on short notice.[12]   Lewis characterizes
these comments as "stereotypical comments made about a single
African-American female's ability to combine work and motherhood,
handle child care issues, and her marital status."   Doc. 22 at 34.

"Direct evidence of discrimination is evidence, that, if
believed, proves the existence of a fact in issue without inference
or presumption." *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th
Cir. 2002) (internal quotations and citation omitted).   Only the
"most blatant remarks, whose intent could be nothing other than to

---

[12] Additionally, Lewis attempts to establish direct evidence
of discrimination by claiming that Wachovia requested that she
agree to job conditions that were not imposed on other candidates
with regard to the Teller Manager position.   This assertion
is belied by the record, including Lewis's own deposition testimony.
Lewis testified during her deposition that when Jones told her
she might be asked to stay in the Teller Manager position for
more than one year and she asked if this would be required of all
applicants, Jones replied, "Yes, more than likely."   (Lewis
deposition at p. 239).   Without explaining why, Lewis later
changed her testimony via a supplemental declaration submitted
with her response in opposition to Wachovia's motion for summary
judgment, in which she states, "I asked Jones and Hardy would all
of the applicants be asked to commit to stay in the position
longer than a normal applicant and the answer was no."   (Lewis
supplemental declaration at ¶ 22).   The court will disregard
Lewis's contrary statement in her latter declaration. *See Van T.
Junkins & Assocs. v. U.S. Indus.,* 736 F.2d 656, 656 (11th Cir.
1984) ("[A] district court may find an affidavit which
contradicts testimony on deposition a sham when the party merely
contradicts its prior testimony without giving any valid
explanation."); *Bryant v. U.S. Steel Corp.*, 428 F. App'x 895, 897
(11th Cir. 2011) (finding no abuse of discretion when district
court disregarded "sham" affidavit, filed after plaintiff's
deposition had been taken and discovery had closed, that "flatly
contradicted her earlier deposition testimony").   In any event,
it is undisputed that Hardy and Jones also asked James, the other
candidate for the position, to stay in the position for more than
one year, and she agreed.

discriminate on the basis of [an illegal criterion], constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989).  Evidence that merely suggests a discriminatory motive, is, by definition, circumstantial evidence. *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 125 F.3d 1390, 1393-94 (11th Cir. 1997).  *See also Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir. 1997) (evidence is not direct when it only "suggests discrimination" or "is subject to more than one interpretation").

None of these comments is direct evidence of sex or race-based discrimination because none directly indicates an intent not to hire Lewis because of her race or sex.  *See Ferrell v. Masland Carpets, Inc.*, 97 F. Supp. 2d 1114, 1123 (S.D. Ala. 2000) (noting that "[i]t is a rare case [] where there exists actual direct evidence of discrimination" and direct evidence would require statements such as "we won't be hiring you . . . because of conditions of your pregnancy").[13]  In short, no evidence presented

---

[13] Lewis likens the interviewers' comments to examples of direct evidence found in other cases, but the comments in those cases are distinguishable from anything in this record.  *See Haynes v. W.C. Caye & Co., Inc.*, 52 F.3d 928, 930 (11th Cir. 1995) (statement questioning whether "sweet little old lady could get tough enough" to do job and statement that "a woman was not competent enough to do this job" is direct evidence of sex discrimination); *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1518 (11th Cir. 1990) (statement that "no woman would be named to a B scheduled job" is direct evidence of sex discrimination); *Sennello v. Reserve Life Ins. Co.*, 872 F.2d 393, 395 (11th Cir. 1989) (statement that "we can't have women in management" is direct evidence of sex discrimination); *Moore v.*

by Lewis meets the rigorous standard for direct evidence.[14]  If, after having known Lewis and her good work record, would Wachovia's interviewers and decision-makers suddenly create a stereotype for Lewis that would include her race (not a factor when she was initially hired)?  Not unimportant is the fact that the two applicants Wachovia chose over Lewis are black.  Lewis's race is central to her "stereotypical" argument.  But race was not

_____

*Ala. State Univ.*, 980 F. Supp. 426, 433-34 (M.D. Ala. 1997) (statement by supervisor to plaintiff that "I was going to put you in charge of the office, but look at you now" (referring to plaintiff's pregnancy) and supervisor's stated belief that women should stay at home with their families and that the job entailed too much traveling for a married mother like plaintiff are direct evidence of sex discrimination).

[14] Wachovia also argues that the comments are not direct evidence because they are not related to the decision-making process because they were made during the "catching up" time prior to any substantive interview questions being asked of Lewis, or were made during a break in the interview when someone was out of the room.  *See Standard*, 161 F.3d at 1330 (remarks unrelated to the decision making process itself are not direct evidence of discrimination); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) ("stray remarks . . . statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" are not direct evidence).  The court is not persuaded by Wachovia's argument on this point.  The comments were made directly prior to the interviews, in the same room and by the same interviewers who went on to ask the substantive interview questions.  Additionally, some comments were made during the substantive part of the Teller Manager interview, such as when Jones and Hardy asked Lewis whether she could handle the responsibilities of taking care of her son as a single parent and the daily travel inherent with the position, as well as the statement: "they would not be able to excuse [her] from leaving early or coming in late due to childcare or needs for Caleb."  Accordingly, although the court holds that the comments do not constitute direct evidence, it is not because they are "unrelated to the decisional process itself."

something she checked on her EEOC charge of discrimination.  In addition to her indication of a claim of sex discrimination, she only checked the box for "other."  "Other", of course, could mean discrimination proscribed by the FLMA, ADA, ADEA, or PDA, retaliation under any statutory proscription, or a mixed motive act.  The EEOC is not called upon to investigate all possible claims, real or imagined.  It is no surprise that the EEOC closed this file after investigating Lewis's single claim of "sex discrimination."  Lewis does not have to exhaust a race claim under § 1981, but her race claim, if she has one as part of her combined factor argument, existed long before she retained counsel and filed suit.

Further, the court is of the opinion that none of these comments constitute circumstantial evidence of race discrimination. As an initial matter, rather than arguing that she was treated differently than non-blacks or males, Lewis contends that she was treated differently than other black females because she is a single black female with a child.  Insofar as Lewis is alleging discrimination on the basis of single parenthood, neither marital status nor parenthood is a protected category under Title VII. Moreover, Lewis's own framing of her case indicates that she is alleging that she belongs to a protected category comprised of some stereotypical combination of race, gender, and the fact that she is unwed with a child (she claims that she was "tagged with the

27

'Scarlett Letter' of the black unwed mother"). This combination of traits is also not a category protected by the anti-discrimination laws. The court will only consider whether Lewis's allegations raise an inference of discrimination based on the two separate protected categories she does fall under: race and sex. With regard to her race discrimination claim, the court notes that none of the interviewers for either position ever mentioned Lewis's race and later hired a member of her race. Lewis offers no authority for her opinion that the interviewers' questions related to her pregnancy, where her child's father was, whether she was getting assistance, or her ability to manage childcare and work, are circumstantial evidence of racial bias, and the court has found none.

However, with regard to her sex discrimination claim premised on the Retail Teller Coach position, the court finds that there is sufficient authority for the conclusion that the comments made prior to Lewis's interview for this position could be circumstantial evidence of sex discrimination, if they remain unrebutted.[15] The questioning of Lewis's ability to combine work

---

[15] Numerous courts have held that statements concerning a woman's ability to manage work and childcare can be evidence of sex discrimination. *See, e.g., Moore,* 980 F. Supp. at 433-34 (statement by supervisor to plaintiff that "I was going to put you in charge of the office, but look at you now" (referring to plaintiff's pregnancy) and supervisor's stated belief that women should stay at home with their families and that the job entailed too much traveling for a married mother like plaintiff are direct evidence of sex discrimination); *Thompkins v. Morris Brown Coll.,*

and single motherhood and handle child care issues are subject to
more than one interpretation, i.e., they could reflect an intent to
discriminate on the basis of her sex, but they could also reflect
a genuine concern for Lewis and her child's well-being, given the
fact that the interviewers had all known Lewis for several years,
and the comments were made in an attempt to "catch up" with her
since she had her baby.  Indeed, an "inferential leap" is required
from the interviewers' comments to the conclusion that the decision
not to hire Lewis for the position was made with the intent to
discriminate based on the fact that she is female, *see Carter v.
Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir.
1998), but that inference is possible.

   Because Lewis offers, at best, circumstantial evidence, in
order to prove her *prima facie* case of either sex or race-based
discrimination in this failure-to-hire case, she must demonstrate
that "she is a member of a protected class, that she applied for
and was qualified for an available position, that she was rejected,
and that the defendant filled the position with a person outside of
the protected class."  *Walker v. Prudential Prop. & Cas. Ins. Co.*,
286 F.3d 1270, 1274-75 (11th Cir. 2002).  Wachovia relies upon the
fourth element, arguing that Lewis cannot establish a *prima facie*

---

752 F.2d 558, 561-63 (11th Cir. 1985) (holding that statements by
college administrators that men had families and needs different
from women and that administrator saw no need for a female to
have a second job were direct evidence of sex discrimination).

case of race or sex discrimination because she cannot show that
Wachovia hired someone outside of her protected categories for
either the Retail Teller Coach position or the Teller Manager
position.  It is undisputed that Wachovia selected Minniefield, a
black female, for the Retail Teller Coach position and James, also
a black female, for the Teller Manager position.  Accordingly,
under this most-commonly-used method of proving a *prima facie* case
of race and sex discrimination under Section 1981 and Title VII,
Lewis's race and sex discrimination claims must fail.[16]

---

[16] The court also notes that the two decision-makers in this
case, Brown and Hardy, are black women.  The court finds this
fact relevant to Lewis's ability to establish her *prima facie*
case, but not dispositive.  *See Castaneda v. Partida*, 430 U.S.
482, 499 (1977) ("Because of the many facets of human motivation,
it would be unwise to presume as a matter of law that human
beings of one definable group will not discriminate against other
members of their group."); *Oncale v. Sundowner Offshore Servs.,
Inc.*, 523 U.S. 75, 78 (1998) (noting that "in the [] context of
racial discrimination in the workplace we have rejected any
conclusive presumption that an employer will not discriminate
against members of his own race" and holding that "nothing in
Title VII necessarily bars a claim of discrimination 'because of
. . . sex' merely because the plaintiff and the defendant (or the
person charged with acting on behalf of the defendant) are of the
same sex."); *Sims v. Montgomery County Comm'n*, 766 F. Supp. 1052,
1067 n.12 (M.D. Ala. 1990) ("one would have to be truly naive to
assume that women cannot sexually discriminate against women and
that many women do not harbor stereotypical, limited views of
themselves") (internal quotation marks omitted).  *But see Holston
v. The Sports Authority, Inc.*, 136 F. Supp. 2d 1319, 1335 (N.D.
Ga. 2000) (where the "decision makers are in the same protected
class as the employee complaining about an adverse employment
decision, the employee faces a more difficult burden in
establishing that a discriminatory animus played a role in the
decision complained about") (internal citation omitted); *aff'd
without opinion*, 251 F.3d 164 (11th Cir. 2001); *Welch v. Delta
Air Lines, Inc.*, 978 F. Supp. 1133, 1153 (N.D. Ga. 1997) ("[I]t
is extremely difficult for a plaintiff to establish

Lewis urges this court to remember that the Supreme Court, as well as the Eleventh Circuit, has repeatedly emphasized that the *McDonnell Douglas* test is merely one way of creating an inference of discriminatory intent. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous."); *U.S. Postal Serv. Bd. of Govs. v. Aikens*, 460 U.S. 711, 715 (1983) ("The *prima facie* case method established in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."); *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1556 n.12 (11th Cir. 1995) ("Our cases have repeatedly stressed that an overly strict formulation of the elements of a prima facie case is to be avoided. . . . Whether a prima facie case has been established is a fact specific inquiry: Would an ordinary person reasonably infer discrimination if the facts presented remained unrebutted?") (internal citation omitted); *Rioux v. City of Atlanta*, 520 F.3d 1269, 1275-76 (11th Cir. 2008) ("More than one formulation of the elements of a prima facie case exist. The Court in *McDonnell Douglas* recognized this when it articulated four elements for a prima facie case but stated that '[t]he facts

---

discrimination where the allegedly discriminatory decision-makers are within the same protected class as the plaintiff.").

necessarily will vary in Title VII cases, and the specification .
. . of the prima facie proof required . . . is not necessarily
applicable in every respect to differing factual situations.'")
(internal citation omitted).

Following this guidance, Lewis urges this court to find that
she has established a *prima facie* case of race and sex
discrimination, without using comparative evidence, but instead by
presenting "some additional factor that would allow an inference of
discrimination." *See White v. Verizon South, Inc.*, 299 F. Supp. 2d
1235, 1241 (M.D. Ala. 2003).[17]   Lewis contends that the
"stereotypical" comments made by the interviewers are sufficient to
constitute this "additional factor."    Indeed, courts have
occasionally fashioned alternative elements to a *prima facie* case
where the traditional elements were not applicable due to unique
factual circumstances.   However, those cases involved factual
scenarios different from those presented here. For example, in *Nix
v. WLCY Radio/Rahall Communications*, 738 F.2d 1181 (11th Cir.
1984), the plaintiff was terminated for misconduct, and while he

---

[17] In *White*, the district court framed the *prima facie* case
on a gender-based denial of a promotion claim to require only
that the plaintiff was (1) a member of the protected class; (2)
qualified for the sought-after position, (3) denied the
promotion; and "(4) some additional factor that would allow an
inference of discrimination."  However, in *White*, the court
actually relied on the traditional *prima facie* case.  *See id.*
("There is no doubt that White has established a prima facie case
of discrimination . . . "[T]he promotion  was filled by a
candidate who was not a member of []White's protected class.").

could not show that he was *replaced* by someone outside of his protected class, the court held that he established a *prima facie* case of race discrimination by alleging that his employer *retained* an employee outside of his protected class even though that employee engaged in nearly identical misconduct as plaintiff. *Id.* at 1185. In another discriminatory termination case, *Hunter v. Mobis Alabama, LLC*, 559 F. Supp. 2d 1247 (M.D. Ala. 2008), the plaintiff's employer terminated her after finding out she was pregnant, and while she had no comparator, i.e., a similarly-situated non-pregnant person who was treated more favorably, the district court held that other circumstantial evidence present in the record was sufficient to establish the prima facie case of discrimination. *Id.* at 1257. This other evidence included 1) an email from plaintiff's supervisor to another supervisor shortly after it became known that plaintiff was pregnant stating "I do not want to take care of [plaintiff] anymore . . . I need your help to terminate her."; 2) a statement made directly to plaintiff by her supervisor, after discovering that she was pregnant, that: "I can't afford to take care of an employee like you."; and 3) another employee's warning to plaintiff not to tell her supervisor that she was pregnant because "of a previous employee that was fired in regards to being pregnant." *Id. Nix* and *Hunter* involved discriminatory termination claims, not failure-to-hire claims, and unlike in those cases, Lewis has not alleged that others outside of

her protected classes were treated differently than she was, nor has she presented evidence of other unique circumstances that warrant deviation from the traditional *prima facie* case.  As earlier pointed out, Lewis has abandoned her pregnancy claim.  Can she add it as circumstantial evidence in support of her later discovered race claims?  This court does not think so.  If it did, the court would have to point out the very high percentage of unwed white mothers who arguably could form a part of a disfavored stereotypical group.

In another case cited by Lewis, *Howard v. Roadway Express, Inc.*, 726 F.2d 1529 (11th Cir. 1984), the Eleventh Circuit held that the fact that a black person was hired after the employer had rejected the black plaintiff's application was not a deciding factor barring establishment of the *prima facie* case.  *Id.* at 1535. Instead, several other facts there could create an inference of race discrimination, including that "two black applicants apparently did not apply at the same time, so there was no analogous choice between blacks," and in fact, there was an eleven month time lapse between the plaintiff's rejection and the hiring of another black applicant, which the court reasoned "significantly diminish[ed] the reliability of the subsequent hiring as an indicator of [the employer's] intent at the time it rejected [the plaintiff's] application." *Id.* at 1534 n.4 & 1535.  Additionally, during that eleven month time period, plaintiff filed an EEOC

34

charge, "suggest[ing] that the hiring might have been motivated by the filing." *Id.* The plaintiff also presented evidence that regardless of the fact that the person ultimately hired was black, the plaintiff had been "denied employment as a result of a racially discriminatory practice, *i.e.*, the requirement that black applicants, unlike their white counterparts, undergo polygraph examinations." *Id.* In sharp contrast to *Howard*, in the present case, Minniefield and James, both black, female applicants, interviewed on the same days as Lewis, and Wachovia made its hiring decisions before Lewis filed her EEOC charge.

Unlike the plaintiffs in *Nix*, *Hunter*, and *Howard*, Lewis has not shown that any reason exists for the court to depart from the comparative evidence method of establishing the *prima facie* case of discrimination. *See White*, 299 F. Supp. 2d at 1241 (stating, "To be sure, courts have rejected a rigid application of the prima-facie case. Nevertheless, the prima-facie case must still include evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.") (internal citation, quotation marks, and alterations omitted). The court has previously found that the interviewers' comments and questions do not constitute circumstantial evidence of race discrimination. To hold otherwise would discourage or preclude conversation to bring the parties up to date. Lewis has failed to establish a *prima facie* case on her race discrimination claims

35

arising either from the Retail Teller Coach and/or Teller Manager interview because Wachovia hired black individuals for both positions, and Lewis has not provided any other evidence of discrimination on the basis of race. *See Holifield v. Reno*, 115 F.3d 1555, 1563 (11th Cir. 1997) (without an example of a comparator, "summary judgment is appropriate *where no other evidence of discrimination is present*.") (emphasis added).

With regard to her sex discrimination claim premised on the Retail Teller Coach position, the court has previously noted that the interviewers' comments questioning Lewis's ability to combine work and single motherhood and handle child care issues arguably constitute circumstantial evidence of sex discrimination. However, considering the totality of the circumstances, although the interviewers discussed personal issues with Lewis prior to her actual interview, the court will not ignore the overwhelming facts that all four of the interviewers are female, all four have children of their own, with Covington giving birth most recently in June 2008, and, most importantly, Brown decided to hire Minniefield for the position, a female with a child. Under these circumstances, the court concludes that Lewis has not carried her burden of providing evidence sufficient to permit a reasonable trier of fact to infer that Wachovia's failure to hire her for the Retail Teller Coach position was based on an animus illegally motivated by the fact that she is female. Accordingly, Lewis has

not established a *prima facie* case of sex discrimination.

Even assuming Lewis were able to establish a *prima facie* case of some sort of proscribed discrimination, her claims would nonetheless fail under the *McDonnell Douglas* burden shifting analysis.  As its legitimate, nondiscriminatory reasons, Wachovia argues that it did not hire Lewis for the Retail Teller Coach position because Brown believed Lewis did not provide a fully truthful answer to one of the interview questions and because Lewis failed to use relevant examples in her responses to the questions. Wachovia says that it selected Minniefield instead of Lewis for the Retail Teller Coach position because she met the qualifications for the position, she received the highest ratings during the interview process, and she had significant relevant experience.  One articulated and unrebutted reason is enough.  With regard to the Teller Manager position, Wachovia argues that it did not select Lewis because Hardy believed Lewis was no longer interested in the position, and that she selected James for the job because she met the qualifications for the position, she agreed to commit to staying in the position for at least one year, and she had significant relevant experience.

Wachovia has met its intermediate burden.  *See Holifield*, 115 F.3d at 1564 (noting that the defendant's burden to articulate legitimate, non-discriminatory reasons is "exceedingly light").  As such, "the presumption [of discrimination] raised by the *prima*

*facie* case is rebutted and drops from the case," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993), and the burden shifts back to Lewis to show that Wachovia's actions were a pretext for discrimination.

In her response brief, Lewis attempts to establish pretext by alleging that 1) the comments made before both interviews reflect discriminatory animus; 2) Minniefield was so much less qualified than Lewis for the Retail Teller Coach position that no reasonable person would have chosen her over Lewis for that position; 3) Wachovia's stated reasons for denying Lewis the Retail Teller Coach position, which were that she answered questions untruthfully and unsatisfactorily, are manifestly unbelievable because Lewis answered the questions truthfully, satisfactorily, and never had any integrity issues; 4) with regard to the Teller Manager position, Lewis disputes Wachovia's stated reason for not hiring her, which was that she declined the position because it was too far of a drive from her home, and 5) Wachovia offers shifting reasons for its failure to hire Lewis for the Teller Manager position, stating both that Lewis was offered but declined the position and that Lewis withdrew her application.

Lewis fails to establish pretext, despite the fact that she has circumstantial evidence of sex discrimination in the interviewers' comments, because she fails to "meet the employers reason[s] head on and rebut [them]." *Chapman v. AI Transport,* 229

38

F.3d 1012, 1030 (11th Cir. 2000).

More specifically, with regard to Lewis's second argument, the Eleventh Circuit has stated, "In a failure to promote case . . . a plaintiff cannot prove pretext by simply arguing or even by showing that [s]he was better qualified than the [employee] who received the position [s]he coveted." *Alexander*, 207 F.3d at 1339 (internal quotations omitted). Rather, a plaintiff must show that the disparities between the successful applicant's and her own qualifications were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff...." *Cooper v. Southern Co.,* 390 F.3d 695, 732 (11th Cir. 2004); *see also Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 456-57 (2006) (approving of this language in *Cooper*). Although Lewis argues that she received more awards and accolades than Minniefield during their employment, and that she helped develop Minniefield as a Teller Manager, Lewis does not dispute that Minniefield met the qualifications for the Retail Teller Coach position because she had over three years of Teller experience and three and a half years of leadership experience as a Teller Manager. Lewis also does not dispute that Brown did not base her hiring decision not only on experience and education but also on the applicants' answers to the same interview questions and that Minniefield received higher scores. Answers to interview questions is a reasonable and usual way by which a

reasonable employer selects one candidate over the other.  *See Chapman*, 229 F.3d at 1030 ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it."). Accordingly, Lewis fails to rebut Wachovia's reasons for choosing Minniefield for the position.

With regard to Lewis's third argument, Lewis's opinion that she answered all interview questions truthfully and satisfactorily, is irrelevant to whether Brown had an honest belief that Lewis was not truthful and sufficient in her responses.  As an initial matter, while the record is devoid of any evidence as to what Lewis's "untruth" consisted of, this reason articulated by Wachovia makes business sense and provides no basis for a jury decision on pretext. "A plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir. 1997).  Pretext means that an employer lied or "made up" the reason, and does not honestly believe the reason it offers. *Jones v. Bessemer Carraway Med. Cntr.*, 137 F.3d 1306, 1313 n.11 (11th Cir. 1998), *superseded in part on denial of rehearing by* 151 F.3d 1321 (11th Cir. 1998).  Lewis has not put forth any evidence calling Brown's sincerity of belief into question, which she must do to establish pretext. *See Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002) (stating that

"[a] showing that a defendant has lied about the reasons for his acts—that he had a 'dishonest belief' in the reasons—can be strong evidence that a defendant acted with discriminatory intent", but "[a] plaintiff trying to show pretext on a defendant's dishonest belief of the grounds the defendant gave for his decision does not succeed by presenting evidence that the defendant was mistaken about the facts upon which he based his alleged non-discriminatory decision."); *Dawson v. Henry Cty. Police Dep't*, 238 F. App'x 545, 549 (11th Cir. 2007) ("The pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of facts underlying the explanation without impugning the employer's honest belief, fails to create a triable pretext issue.") (citing *Elrod v. Sears Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).

Accordingly, even if Lewis had established a *prima facie* case, she has not shown that Wachovia's reasons for making the hiring decision for the Retail Teller Coach position are a pretext for unlawful race or sex discrimination, and summary judgment will be granted on Lewis's race and sex discrimination claims insofar as they are premised on the April 17, 2009 Retail Teller Coach interview.

With regard to Lewis's pretext arguments related to the Teller Manager position, an argument foreclosed by non-exhaustion, Hardy has stated that she believed Lewis was not interested in the Teller

Manager position based on Cook telling her that it was too far of a drive from Lewis's home.  Admittedly, Lewis denies that she ever told Cook that she was not interested in the position because it was too far a drive from her home, and the record is unclear as to why Cook told Hardy and Jones this.  However, Lewis does not dispute that Cook told Jones and Hardy that Lewis was no longer interested in the position for this reason, and that they believed her.  Lewis has not shown that Hardy either did not rely on Cook's statement or that she relied on it knowing it to be false, which she must do to establish pretext.  *See Curtis v. TeleTech Cust. Care Mgmt. (Telecomms.), Inc.*, 208 F. Supp. 2d 1231, 1246 (N.D. Ala. 2002) (stating that when a decision-maker relies on a report from another employee, a plaintiff must show that "the decisionmaker either did not rely on that report or that the decisionmaker did rely upon the report but knew it was false").[18]

Nor has Lewis established that Wachovia offered inconsistent reasons for its failure to hire her for the Teller Manager position.  In its answers to interrogatories, Wachovia stated that Lewis was offered the position but declined it because it was too far to drive.  This is consistent with Lewis's failure to mention the second interview in her EEOC charge.  In its motion for summary

---

[18] If Wachovia had articulated a reason regarding its **own** doubts about Lewis's ability to drive from Calera to Hueytown every day and being on time, there might be some further discussion.

judgment, Wachovia states that it did not hire Lewis because Hardy believed that Lewis was "no longer interested in the position." Doc. 17 at 20. From this, Lewis finds a genuine issue of material fact as to whether she was offered and declined the position, or whether she withdrew her application. However, these explanations are not inconsistent, but are merely two ways of saying the same thing, i.e., that Lewis stated that she was no longer interested in the position due to the length of the commute. *See Phillips v. Aaron Rents, Inc.*, 262 F. App'x 202, 210 (11th Cir. 2008) ("If an employer offers different reasons for [the adverse action], those reasons must be fundamentally inconsistent in order to constitute evidence of pretext."). Indeed, whether Cook offered the position to Lewis and she declined it or whether Cook never offered her the position before she withdrew her application is not is relevant because Cook is not the decision-maker with regard to the Teller Manager position, and as noted, Lewis does not dispute that Hardy believed Cook when she told her that Lewis was no longer interested due to the length of the commute.

Further, Lewis has failed to make any arguments to rebut Wachovia's stated reasons for hiring James, i.e., that James met the qualifications, scored higher on her responses to interview questions, and verbally committed to staying in the Teller Manager position for more than one year. Because Lewis has failed to address these reasons given by Wachovia, Wachovia is entitled to

summary judgment on Lewis's § 1981 claim premised on the Teller Manager interview.  *See Chapman*, 229 F.3d at 1024-25 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether **each** of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.") (emphasis added).

In sum, while the interviewers' questions and comments were perhaps too personal in nature given the interview settings, Lewis has failed to demonstrate that the comments alone raise a triable fact issue as to whether Wachovia's decisions not to hire her were motivated by racial and/or gender animus, as to the Retail Teller Coach position, or racial animus, as to the Teller Manager position.  Assuming that Lewis has presented sufficient evidence to establish a *prima facie* case of discrimination for the claims that are not administratively barred, which she has not, she has not established that the legitimate reasons articulated by Wachovia are a pretext for unlawful race or sex discrimination.  Accordingly, Lewis does not have sufficient evidence of discrimination to survive judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, Wachovia's motion for summary judgment will be granted as to all of Lewis's claims.  A separate order will be entered effectuating this opinion.

44

DONE this 22nd day of November, 2011.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE